# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 10, 2008          Decided May 16, 2008

No. 07-7077

JAMES ADEYEMI,
APPELLANT

v.

DISTRICT OF COLUMBIA,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 04cv01684)

---

*Leah M. Quadrino* argued the cause for appellant. With her on the briefs was *Steven Reed*.

*Mary T. Connelly*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With her on the brief were *Peter J. Nickles*, Interim Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General. *Edward E. Schwab*, Deputy Attorney General, entered an appearance.

Before: GRIFFITH and KAVANAUGH, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: James Adeyemi is deaf. After failing to obtain an information technology position in the D.C. Public School System, he sued the District of Columbia for unlawful employment discrimination under the Americans with Disabilities Act. The District of Columbia responded that it hired two candidates who were better qualified than Adeyemi. The U.S. District Court granted summary judgment for the District of Columbia. We affirm: Adeyemi did not produce sufficient evidence for a reasonable jury to find that the District of Columbia's legitimate, non-discriminatory reason – that it hired better-qualified candidates – was not the actual basis for the decision and that it intentionally discriminated against Adeyemi on account of his disability.

I

In 2002, the D.C. Public School System (DCPS) abolished its existing employment positions and advertised the resulting job "vacancies" both within DCPS and to the general public. Incumbent workers could re-apply but were not guaranteed their old jobs.

The DCPS Office of Information Technology announced seven vacancies for Level 11 Information Technology Specialists. The vacancy announcement listed the necessary qualifications in general terms and requested that each applicant submit a resumé and written statement.

The DCPS Human Resources Department screened the applications and selected 20 interviewees for the Level 11 positions. Five of the 20 interviewees were incumbents; they

already worked for DCPS in the Office of Information Technology. Two IT employees were assigned to interview the 20 Level 11 candidates. Ulysses Keyes, the Director of Enterprise Information Systems for the Office of Information Technology, was responsible for making the final hiring decisions after considering the applicants' resumés, written statements, experience, and interview performances, as well as DCPS's particular needs.

James Adeyemi applied for the Level 11 position, as well as for a higher-grade Level 12 position. His application did not note his disability. Based on Adeyemi's application, DCPS's Human Resources Department initially determined he possessed the minimal qualifications for the Level 11 position (but not for the higher-grade Level 12 position) and selected him as one of the 20 Level 11 interviewees.

Manuel Farfan and Henry Thompson interviewed Adeyemi. Farfan and Thompson first learned that Adeyemi was deaf when he arrived for his interview. Because a sign-language interpreter was not available on such short notice, Farfan and Thompson typed questions that appeared on a computer screen and Adeyemi then typed his responses. During the interview, Thompson also passed Adeyemi a note asking how he communicated in offices where no one knew sign language. Adeyemi responded that he often used written communication, and he explained that he had "no problem with writing as [his] basic communication." Interview Notes, Joint Appendix ("J.A.") 130.

When Farfan, Thompson, and Keyes later met to discuss the applicants, Farfan asked Keyes how DCPS could accommodate Adeyemi if he were hired. Keyes stated "we can always accommodate him." Farfan Deposition, J.A. 331.

After all of the interviews were completed, DCPS offered five of the seven available Level 11 positions to the five incumbents who had interviewed. Keyes later explained that the incumbents had desirable "qualifications, experience, and backgrounds" and performed well in their interviews. Keyes Deposition, J.A. 21. Moreover, he had concerns about starting the school year with an entirely new staff; the incumbents' institutional knowledge gave them "a very big advantage coming back on board." *Id*. at 55.

For the remaining two Level 11 vacancies, however, Keyes was not satisfied with the pool and decided not to extend offers at that time to any of the numerous other Level 11 candidates. Instead, he asked the Human Resources Department to re-advertise for the remaining two Level 11 vacancies. But this renewed effort still did not produce any viable candidates. At that point, Keyes had his back "against the wall timewise": He had to fill the vacancies within days or risk losing the positions altogether due to funding constraints. *Id*. at 33.

Out of time to find new candidates for the remaining two Level 11 vacancies and not particularly happy with the remaining Level 11 candidates, Keyes looked to the pool of applicants for the separate Level 12 positions. To qualify for the higher-grade Level 12 position, applicants had to meet more demanding knowledge and experience requirements. As noted above, Adeyemi himself had applied for a Level 12 position but did not make the initial cut for the Level 12 interviews.

Keyes asked the Human Resources Department if he could fill a Level 11 position with a candidate who had applied and was qualified for the Level 12 position. Human Resources informed Keyes it was permissible because

candidates qualified for the Level 12 positions were automatically qualified for the lower-grade Level 11 positions.

Keyes then offered the last two Level 11 positions to two Level 12 candidates: Qaiser Iqbal and Cynthia Wang. According to Keyes, Iqbal had desirable skills from his 10 years as a programmer/analyst working with enterprise-wide computer systems in the corporate world; that experience would be useful because Level 11 Specialists used mainframes on a daily basis. Keyes later stated that Iqbal's corporate experience "was really what it came down to." *Id.* at 49. Keyes further explained that Iqbal "was more qualified" and a "better match for [DCPS] than anybody else in the untapped pool, including Mr. Adeyemi." *Id*. at 48.

Keyes stated that he chose Wang for the Level 11 position because she had "documented experience" with the PeopleSoft application. *Id*. at 37. This experience was "very attractive" to DCPS because it was "in the middle of a PeopleSoft implementation" and "in the process of hiring consultants and trying to get staff up to speed with someone who understood the HR portion." *Id*. at 37, 51. None of the Level 11 candidates – including Adeyemi – had PeopleSoft experience.

After learning that he did not obtain the position, Adeyemi filed an administrative complaint with the Equal Employment Opportunity Commission claiming that DCPS had discriminated against him in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. Following an unsuccessful mediation, Adeyemi filed a complaint in the U.S. District Court for the District of Columbia. After discovery was completed, the District Court granted the District of Columbia's motion for summary judgment, finding

that Adeyemi had not established a prima facie case of disability discrimination. *Adeyemi v. District of Columbia*, 2007 WL 1020754, at *21 (D.D.C. 2007). In the alternative, the District Court concluded that Adeyemi had not produced sufficient evidence to cast doubt on DCPS's legitimate, non-discriminatory explanation that it had hired Iqbal and Wang because they were better qualified. *See id.* Adeyemi appeals; we review the District Court's summary judgment de novo.

II

A

The Americans with Disabilities Act makes it unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Putting aside the issue of reasonable accommodation, the two basic elements of a disability discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's disability.

The District Court in this case first carefully analyzed whether Adeyemi had made out a "prima facie case" under the *McDonnell Douglas* analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). On appeal, the parties – particularly the plaintiff – similarly have devoted large portions of their briefs to that question. As we recently explained in *Brady v. Office of the Sergeant at Arms*, however, "the prima facie case is a largely unnecessary sideshow." 2008 WL 819989, at *3 (D.C. Cir. 2008). As Supreme Court precedents establish, the prima-facie-case

aspect of *McDonnell Douglas* is irrelevant when an employer has asserted a legitimate, non-discriminatory reason for its decision – as an employer almost always will do by the summary judgment stage of an employment discrimination suit. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993); *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-16 (1983); *see also Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 856 (8th Cir. 2005) (Colloton, J., concurring in judgment); *Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205, 1221, 1224-28 (10th Cir. 2003) (Hartz, J., concurring). Therefore, if an employer asserts a legitimate, non-discriminatory reason for an adverse employment action, the district court must conduct one central inquiry in considering an employer's motion for summary judgment or judgment as a matter of law: whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis. *See Brady*, 2008 WL 819989, at *2-3.

As we explained in *Brady* and as this case again illustrates, this streamlined approach will assist courts and litigants alike. The district courts can focus on the key question of discrimination without slogging through the *McDonnell Douglas* prima facie factors, which in any event do little more than generate "enormous confusion." *Id.* at *3. And litigants need not devote briefing and oral argument to the often difficult and usually irrelevant prima-facie-case question.[1]

---

[1] Although the prima facie case is ultimately irrelevant here, Adeyemi correctly points out that the District Court did not analyze the factors that previous cases have identified. The District Court asked whether Adeyemi: (1) had a disability; (2) was qualified for the position; and (3) suffered an adverse employment action

8

B

In this disparate-treatment disability discrimination suit, as in most cases that reach court, the parties do not dispute that the plaintiff suffered an adverse employment action under the statute – here, not being hired. DCPS has asserted a legitimate, non-discriminatory reason for not hiring Adeyemi – namely, that it hired Iqbal and Wang because they were better qualified. We therefore turn directly to the central issue: whether Adeyemi produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated against Adeyemi based on his disability. When considering whether summary judgment or judgment as a matter of law is warranted for the employer in an employment discrimination case, the court considers all relevant evidence presented by the plaintiff and defendant. *See Brady*, 2008 WL 819989, at *3.

Adeyemi challenges DCPS's qualifications-based explanation on three main grounds.

---

because of his disability. In analyzing the third factor, the court focused on the question of causation – that is, whether plaintiff was not hired *because of* his disability. However, even under the original *McDonnell Douglas* test that was used pre-*Aikens*, the prima facie case did not require a full causation analysis in a failure-to-hire case, but only asked whether after the rejection, "the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas*, 411 U.S. at 802. In any event, this further illustrates our point that "[d]isagreement and uncertainty over the content, meaning, and purpose of the *McDonnell Douglas* prima facie factors have led to a plethora of problems," thereby "wasting litigant and judicial resources." *Brady*, 2008 WL 819989, at *2 n.1, *3.

9

*First*, according to Adeyemi, a reasonable jury could find discrimination because he was not hired despite his high ranking within the Level 11 applicant pool. But when an employer says it made a hiring or promotion decision based on the relative qualifications of the candidates, a plaintiff can directly challenge that qualifications-based explanation only if the plaintiff was "*significantly* better qualified for the job" than those ultimately chosen. *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006). The qualifications gap must be "great enough to be inherently indicative of discrimination." *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) (internal quotation marks omitted). Only then could the fact-finder "legitimately infer that the employer consciously selected a less-qualified candidate – something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Id.* (internal quotation marks omitted). In cases where the comparative qualifications are close, a reasonable jury would not usually find discrimination because the jury would "assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." *Aka* v. *Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc); *see also Jackson*, 496 F.3d at 707. We must "respect the employer's unfettered discretion to choose among qualified candidates." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). To conclude otherwise, we have said, "would be to render the judiciary a super-personnel department that reexamines an entity's business decisions – a role we have repeatedly disclaimed." *Jackson*, 496 F.3d at 707 (internal quotation marks omitted).

The record here shows that Adeyemi was not as qualified as either Iqbal or Wang – much less "*significantly* better qualified," as our cases require. *Holcomb*, 433 F.3d at 897.

Unlike Adeyemi, both Iqbal and Wang possessed the requisite qualifications not just for the Level 11 position but also for the higher-grade Level 12 position. Both Iqbal and Wang also possessed significant experience that Adeyemi largely lacked – Iqbal with mainframe computers and Wang with PeopleSoft. To be sure, as Adeyemi notes, those particular qualifications were not specifically mentioned in the vacancy announcement. But they were fairly encompassed within the announcement, which sought candidates with a broad range of computer knowledge and skills. And as this Court has explained, the fact that an employer "based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not itself raise an inference of discrimination sufficient to overcome summary judgment." *Jackson*, 496 F.3d at 709.

Adeyemi points out that his interview score tied him for fifth place among the 20 people who interviewed for the Level 11 positions and that the Human Resources Department ranked him fourth overall out of the 20 original applicants deemed eligible for the Level 11 positions. For purposes of summary judgment, we accept that characterization of the scores. But the problem for Adeyemi is that those facts do not show he was significantly better qualified than the two successful candidates, Iqbal and Wang. To begin with the obvious: Both Iqbal and Wang made the initial cut to be interviewed for the higher-grade Level 12 positions. Adeyemi did not make that cut. And the Level 12 cut occurred before DCPS knew he was deaf, thereby establishing that the initial Level 12 cut was not discriminatory, a point Adeyemi does not contest. Wang interviewed only for the Level 12 positions, so she was not even part of the Level 11 rankings that Adeyemi relies on. Iqbal interviewed for both the Level 11 and Level 12 positions. But the record is silent as to Iqbal's overall rank in the Level 11 pool. Indeed, he

could have ranked first, second, or third in that Level 11 pool. In any event, a slight difference in ranking would not show that Adeyemi was "significantly better qualified," particularly given Iqbal's mainframe experience and DCPS's needs. Adeyemi also notes that his interview score in isolation was slightly higher than Iqbal's Level 11 interview score, but such small differences were considered "a wash." Keyes Deposition, J.A. 59. Moreover, as in most job hiring situations, the interview score here was only one of many factors DCPS considered in the hiring process; DCPS also weighed the applicants' experience and qualifications, as well as DCPS's needs.

Adeyemi also asserts that there is no contemporaneous evidence of DCPS's qualifications-based explanation. And Adeyemi hints that DCPS has manufactured its justifications after the fact. But the absence of contemporaneous evidence is hardly unusual; employers ordinarily do not "publish a contemporaneous statement of reasons every time they make a hiring or firing decision." *Jackson*, 496 F.3d at 710. We therefore decline to find any significance in the timing of DCPS's explanation.

In short, under our precedents, the evidence of comparative qualifications here does not raise an inference of discrimination sufficient for Adeyemi to overcome summary judgment; in fact, the evidence of Iqbal's and Wang's superior qualifications tends to undermine any suggestion of discrimination.

*Second*, Adeyemi argues that a reasonable jury could find discrimination from the supposed "irregularities" in DCPS's hiring process – namely, that DCPS (i) re-advertised the Level 11 position after hiring the five incumbents and then (ii) hired individuals for the Level 11 position from the separate Level

12 candidate pool. Adeyemi finds it suspicious that DCPS passed over the remaining candidates in the Level 11 pool. But this does not raise an inference of discrimination because DCPS passed over all non-incumbent candidates. Keyes declined to fill the two vacant Level 11 positions with any of the numerous remaining Level 11 candidates because he was not satisfied that they were the best he could find. He asked Human Resources to re-advertise the positions because he wanted a "star" who could take DCPS "to the next level." Keyes Deposition, J.A. 55. When that proved unattainable, Keyes said "let's settle for a doubles hitter, not a home-run hitter." *Id*. at 57. At that point, Keyes turned to the Level 12 pool. Keyes rationally considered the Level 12 applicants superior to the Level 11 applicants because those who qualified for the Level 12 position possessed greater knowledge and experience. Moreover, Keyes had personally interviewed the Level 12 candidates and testified that he felt he knew them. A reasonable jury ordinarily cannot find discrimination simply from the fact that an employer takes extra steps to find better-qualified employees. Here, therefore, we do not believe a reasonable jury could find unlawful discrimination in the sequence of events by which DCPS filled the final two Level 11 positions.

*Third*, Adeyemi points to statements made by DCPS employee Thompson that, according to Adeyemi, evince a discriminatory animus. As Adeyemi correctly argues, this Court has held that a plaintiff may overcome summary judgment by presenting specific evidence suggesting the "decision maker harbors discriminatory animus." *Holcomb*, 433 F.3d at 899. But Adeyemi has not presented sufficient evidence to meet this standard.

Adeyemi focuses on one of Thompson's interview questions and Thompson's subsequent explanation of that

question. During the interview, Thompson asked Adeyemi how he communicated in offices where no one knew sign language; during his deposition, Thompson explained that he had asked that question because he did not know whether and how a reasonable accommodation could be made. But the Americans with Disabilities Act expressly permits employers "to make preemployment inquiries into the ability of an applicant to perform job-related functions"; therefore, Thompson could lawfully inquire how Adeyemi would perform specific job-related tasks. 42 U.S.C. § 12112(d)(2)(B), *see* 29 C.F.R. § 1630.14(a); 29 C.F.R. Pt. 1630, App. § 1630; *ADA Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations*, http://www.eeoc.gov/policy/docs/medfin5.pdf. We agree with the District Court that Thompson's question and discussion about possible accommodation were "entirely appropriate" given the circumstances here. *Adeyemi v. District of Columbia*, 2007 WL 1020754, at *18 (D.D.C. 2007). And contrary to Adeyemi's argument, we see nothing in Thompson's deposition explanation of the interview to suggest discriminatory animus.

In any event, Thompson was not the decisionmaker for those positions. Rather, Keyes made the hiring decisions, and he did not express any concern about DCPS's ability to accommodate Adeyemi. On the contrary, Keyes expressed confidence that DCPS *could* and *would* accommodate Adeyemi's deafness if Adeyemi were hired.

In short, Thompson's statements do not suffice for Adeyemi to overcome summary judgment.

14

\* \* \*

We affirm the judgment of the District Court granting summary judgment to the District of Columbia.

*So ordered.*